JANVIER, Judge.
On June 15, 1953, while plaintiff, an unskilled laborer, was engaged in the hazardous business of his employer, Pipe Line Service Corporation, the sharp edge of a piece of a metal drum containing tar which was being cut open with an ax struck him in the rear of his left leg, inflicting a severe injury and severing the achilles tendon in the rear lower portion of the left leg above the heel.
He was taken to Dr. J. W. Atkinson, a general medical practitioner, who cleaned and dressed the wound and who, not being an orthopedic surgeon, sent him to the Flint-Goodridge Hospital and referred the case to Dr. Lyon K. Loomis, an expert and specialist in orthopedic treatment and surgery. The severed tendon was sutured and the entire lower portion of the left leg was placed in a plaster cast. The cast remained on the leg until June 29th when it was changed and another similar type of cast was applied which encompassed the entire leg “up to the groin,” and which second cast was removed on September 2nd. At that time the wire and the sutures which had been applied and with which the two severed ends of the tendon had been tied together were removed. The plaintiff was then referred back to Dr. Atkinson, by Dr. Loomis with instructions to “check” with him twice a week.
On September 16th, Dr. Loomis saw the plaintiff again “on a routine visit.” He saw him again on September 30th and on October 3rd wrote a letter stating that he was able to return to his former employment. On October 12th, Dr. Atkinson discharged plaintiff as able to return to work, but told him that if he had any trouble to come back for further treatment.
The plaintiff did not return to Dr. Atkinson, but on January 18, 1954, brought this suit against his former employer and its compensation insurance carrier, averring that he is totally and permanently disabled and praying for compensation at $30 per week for 400 weeks, less compensation payments previously made, and also praying for 12% as a penalty for arbitrary refusal *707 to make compensation payments and for an attorney’s fee of $1,000.
From a judgment dismissing his suit, plaintiff has appealed.
The medical testimony was given by four doctors, three of whom say that plaintiff is able to perform all of the duties of his former employment as a laborer and the fourth of whom, Dr. Blaise Salatich, says that he cannot do so.
Dr. Loomis is very positive that no appreciable permanent disability has resulted from the injury. He said that “this fellow I felt had especially good repair.” He said also that on his final examination, which was made before plaintiff was discharged as able to return to work, “there was no limitation of motion, * * * complete range of activity and passive motions in the left ankle.”
It is true that he said that after any such accident there remains some slight disability; that he estimates the disability to the foot at not more than five or ten per cent and that he was certain that, in spite of this slight disability to the foot, there was no overall disability and that therefore, if plaintiff had been willing to do so, he could have returned to the full duties of his former occupation.
Dr. Atkinson was equally certain that plaintiff had fully recovered and could have resumed his former’ duties.
Dr. George C. Battalora, admittedly an orthopedic expert, said that when he examined plaintiff he “walked without any limp. He could stand on his heels or his toes. When he stood on his toes, the tendon, the achilles, stood out well indicating that there was continuity in the tendon. * * * ” He said too “that he had excellent function in the calf muscles and the tendon achilles in the left leg.” He was asked whether he knew that the plaintiff was a laborer and what kind of work he had done and whether he could return to that kind of work, and he answered: “I thought he should be able to resume his previous occupation.” He also said that the resulting disability to the foot amounted to a possible ten per cent but that that disability to the foot would not affect his overall ability to perform “his usual work as a laborer.”
As against the testimony of these doctors plaintiff relies upon the testimony of Dr. Salatich who stated that his overall disability amounted to about thirty per cent and that he could not perform the duties of a common laborer. He also added that “achilles tendon injuries are significant and carry a significant degree of residual disability.” He found from X-ray photographs that, what he terms osteoporosis, was present and while it is difficult from the testimony of Dr. Salatich to determine just what is meant by osteoporosis, we find from all of the evidence and from an examination of Webster’s New International Dictionary that osteoporosis is: “Absorption of bone so that the tissue becomes unusually porous and fragile, occurring esp. in old age.”
Dr. Salatich states that he did not make an examination of the right leg to see whether there was also osteoporosis in the bone of that leg.
Dr. Salatich based his opinion that plaintiff is totally disabled to some extent on his belief that in an injury of that kind, in addition to the severing of the tendon, considerable damage usually results because of the fact that a blunt object causes more injury to surrounding tissue than if the severing of the tendon is done by some sharp instrument such as a surgeon’s knife.
The fact of the matter is that the record abundantly shows that the cut was remarkably clean and sharp and that the other doctors unanimously agree that it was just as clean and sharp as if it had been made by a surgeon’s scalpel.
As to the presence of osteoporosis, the doctors agree that this usually results where bones of the leg or of the arm are placed in a cast, but they state that the effect of it disappears within a reasonably short time and Dr. Loomis, when asked about osteoporosis, said that such osteoporosis as may have resulted was not disabling and that *708 on his later examination there was much' less than was shown in the X-ray pictures which had been made in September. He said that the amount of osteoporosis was so small that “from a professional angle, I just don’t see it. * * ■* It would be unusual if it weren’t there.”
Counsel for plaintiff very vehemently criticizes what he says was the refusal of defendant to permit Dr. Battalora to examine the plaintiff in Court during the progress of' the trial.
In his brief he refers to this refusal as “shocking”. The fact of the matter is that the record shows beyond any possible doubt that counsel for defendant did not refuse but- on the contrary, granted full permission to have Dr.. Battalora examine the plain-, tiff during the trial, but insisted that it be after the adjournment on that day.. When counsel for plaintiff asked that Dr. Batta-; lora examine the plaintiff “now”-, counsel for defendant replied that if Dr. Battalora could throw any further light on the matter he had no objection. The Judge then stated:
“I cannot complete the case today and we quit at four o’clock. You can have the examination made then. I have no authority to compel the doctor to examine anybody.”
Counsel for plaintiff then said that he wanted to make the point of having the record show that counsel for the defendant “refuses to have Dr. Battalora examine the man in Court, as of today; right now.” The Judge answered:
“He doesn’t have to do that,”
and then counsel for defendant said:
“I want the record to show that is absolutely not so and that I say to Mr. Kammer now, if he desires an examination by Dr. Battalora or any other doctor of .his man this afternoon, I will certainly sit here and wait for it to be done. I have no obj ection to it.”
Counsel for plaintiff made no further ef-' fort then or thereafter to have a further examination made by Dr. Battalora or by anyone else.
Our con'clusion is that the record overwhelmingly demonstrates that the plaintiff could have returned to work at any time had he been willing to do so.
The judgment appealed from is affirmed at the cost of plaintiff.
Affirmed.